¶ 1.
MICHAEL J. GABLEMAN, J.
This is a review of a published decision of the court of appeals[2] that affirmed the Dodge County Circuit Court's[3] findings that (1) Patrick Lynch ("Lynch"), the defendant, made an adequate showing for an in camera review of the complainant's privileged mental health treatment records and (2) the complainant's testimony must be excluded at trial because the complainant refused to disclose her privileged mental health treatment records.
¶ 2. This case requires us to reexamine State v. Shiffra, 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993) modified by State v. Green, 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298 (hereinafter Shiffra/Green). Shiffra/Green established a process *4 under which a criminal defendant in Wisconsin could obtain an in camera review of a person's privileged[4] mental health treatment records. Under Shiffra / Green, a defendant can acquire a complainant's privileged mental health treatment records when he[5] demonstrates "a reasonable likelihood that the records contain relevant information necessary to a determination of guilt or innocence . . . ."[6] Green, 253 Wis. 2d 356, ¶ 19.
¶ 3. In this case, Lynch filed a pretrial motion pursuant to Shiffra / Green, seeking an in camera inspection of "all psychiatric, psychological, counseling, therapy and clinical records" of the complainant for the treatment she received during the time period 1993-2011. The circuit court granted Lynch's motion for in camera review of the complainant's privileged mental health treatment records and ordered the complainant to sign a release of records. Further, the court informed the complainant that if she refused to turn over her privileged mental health treatment records, *5 her testimony would be "barred at trial." The complainant refused to give up her privileged mental health treatment records "[u]nless and until" the circuit court's determination was reviewed by another court. As a result, the circuit court barred the complainant from testifying at trial. The State appealed, and the court of appeals affirmed the circuit court's order barring the complainant from testifying at trial. The State appealed.
¶ 4. The State makes three arguments on appeal. First, the State argues that we should overrule Shiffra / Green because it originates from a serious misinterpretation of Pennsylvania v. Ritchie, 480 U.S. 39 (1987). Second, the State argues that, if Shiffra /Green remains, we should clarify that witness preclusion (barring a complainant from testifying at trial) is not the only remedy available to the circuit court when a complainant refuses to waive her privilege. Third, the State argues that a circuit court should be able to use Wis. Stat. § 146.82(2)(a)4. (2013-14)[7] to require production of the privileged mental health treatment records even when the complainant refuses to consent to release.
¶ 5. Accordingly, three issues are presented for our review.[8] The first is whether we should overrule *6 Shiffra / Green. The second is whether witness preclusion is the only remedy available to the circuit court when a complainant refuses to waive her privilege. The third is whether a circuit court may use Wis. Stat. § 146.82(2)(a)4. to require production of the privileged mental health treatment records when the complainant refuses to consent to release.
¶ 6. These issues, in particular the first and second issues, have divided this court for a number of years. See State v. Johnson, 2013 WI 59, 348 Wis. 2d 450, 832 N.W.2d 609 (per curiam) (Johnson I), reconsideration granted, 2014 WI 16, 353 Wis. 2d 119, 846 N.W.2d 1 (per curiam) (Johnson IT). These issues continue to divide this court.
¶ 7. Justice Gableman, joined by Chief Justice Roggensack and Justice R.G. Bradley, would overturn Shiffra / Green. Our reasoning is outlined in this lead opinion.[9] Justice Abrahamson and Justice A.W. *7 Bradley would not overturn Shiffra / Green but would interpret Shiffra to allow for additional remedies, including release of the privileged records pursuant to Wis. Stat. § 146.82(2)(a)4. Justice Prosser would not overturn Shiffra / Green, and though he would consider additional remedies, he would not permit a circuit court to compel release of the complainant's privileged records pursuant to § 146.82(2)(a)4. Finally, Justice Ziegler would not overturn Shiffra / Green and interprets Shiffra to allow for a single remedy (preclusion of the privilege-holder's testimony).
¶ 8. We conclude that Shiffra!Green improperly relied on Ritchie when it invented a right to access privileged information (specifically a complainant's privileged mental health treatment records) via a motion for in camera review. We further conclude that Shiffra / Green cannot be grounded in any other legal basis, specifically any other constitutional provision. We would, therefore, overrule Shiffra / Green and its progeny. Consequently, we need not address the second and third issues presented for review.[10]
I. BACKGROUND
¶ 9. As a young child, the complainant was repeatedly sexually assaulted by her father. It was during this period of sexual abuse that the complain *8 ant sought mental health treatment. Her father was eventually charged and convicted of five counts of first-degree sexual assault of a child.
¶ 10. In the case before us, the complainant alleges that during the same time her father was sexually assaulting her, she was also being sexually assaulted by another — the defendant, Lynch. At the time of the alleged sexual assaults, Lynch was a law enforcement officer and was "good friends" with the complainant's father. According to the complainant, Lynch sexually assaulted her on six or seven occasions in her father's home. The following excerpts taken from the complainant's testimony while she was being questioned by Lynch's attorney at his preliminary hearing reveal the nature of three of the alleged sexual assaults:
Q. The first time it happened — let's talk about the first time it happened. You went into this bathroom that you agree was about three feet by five feet approximately.
A. Yes.
Q. And there is a toilet and sink in this small room.
A. Right.
Q. And what you recall is, what, you walked in the bathroom. Did you close the bathroom door?
A. Yes, I was in there going to the bathroom.
Q. Was your dad in the house at the time?
A. Yes, he was.
Q. And [Lynch] opened the door?
A. And came in.
*9 Q. And were your slacks down at that point because you were going to the bathroom?
A. I was pulling them up because I had just finished going to the bathroom.
Q. And did he then take his clothes off?
A. He then put me on the ground.
[[Image here]]
Q. And did he take your clothes off?
A. I had to pull my pants down.
Q. Did he tell you to do that or did he do it?
A. He told me to do it.
[[Image here]]
Q. Did he take his trousers completely off to the best of your recollection?
A. I remember him taking them down. I don't know if they came off completely
Q. You stated that he placed his penis inside of your vagina, correct?
A. Correct.
Q. Did he ejaculate?
A. I don't know.
Q. I know this may be difficult, but approximately how long, in terms of time, was his penis inside of your vagina?
A. Like five or ten minutes.
*10 Q. Did you cry out or scream for help, or did you cry out or scream in pain?
A. No, because I was terrified. He was wearing a cop uniform and he had a gun and I was terrified of what he would do.
Q. To your knowledge did you father know what was going on?
A. Yes.
Q. How do you know that your father knew what was going on?
A. Because he was right outside the door when it was happening.
[[Image here]]
Q. What do you remember happening on the second incident in the winter of 1990?
A. I got called into the bathroom and he told me to take my pants off. That's when he started fondling me.
Q. And did he, during that incident, take off his trousers?
A. Yes.
[[Image here]]
Q. [A]fter he started fondling you, did he place you again on the floor?
A. Yes.
Q. And how long did this incident happen going forward?
A. It felt like hours, but it was probably 15, 20 minutes.
*11 Q. Do you remember if he ejaculated during that time?
A. I would believe so. At that time I — you know, you don't think about anything else. I [was] trying to just block my mind and lay there.
Q. That floor, was it a hard floor or was there a rug on it?
A. Hard.
Q. So like linoleum or something?
A. Cold.
[[Image here]]
Q. So what happened during th[e] [third] occasion?
[[Image here]]
A. I got called down again and I —
Q. Why did you go?
A. Because I felt like I had no choice. I was scared. I was a little girl.
[[Image here]]
Q. Your dad called you down and then [Lynch] took over and —
A. And we went into the bathroom. At that time he made me sit on the toilet and perform oral sex on him.
Q. Did he do — did anything else occur? Did anything else occur during this time besides oral sex?
A. After that he laid me down on the floor and stuck his penis into my vagina.
Q. Were you crying during this incident?
*12 A. Yes.
Q. The first incident were you crying?
A. Yeah.
Q. Second incident were you crying?
A. I had tears.
Q. Third incident when [another person] was there you were crying?
A. Yes, I had tears. I was afraid to make any noise or any sound.
[[Image here]]
The testimony of the complainant reveals that the alleged sexual assaults included forced "fondling," "oral sex," and "intercourse." According to the complainant, all of the sexual assaults took place in a small bathroom (described in the above testimony) next to the kitchen.
¶ 11. The complainant also testified that after her father's trial (which took place a few years after the alleged sexual abuse occurred), Lynch would show up where she worked. The following excerpt, again taken from the complainant's testimony at the defendant's preliminary hearing reveals the nature of the alleged stalking:
Q. Tell us what you saw when you were working there during that time? What happened?
A. The first time I saw him through the drive-thru and he did the same thing that he did at [another workplace] , and he would stare me down and I walked away at that time. I was a supervisor, so I could exit and I didn't have to take transactions. So I would go in back by the vault.
*13 Q. Okay. How many times did that occur during the time that you were working there between May of 2007 and February of2008 that he would go through — that you could see the defendant at the drive-thru?
A. At the drive-thru probably three times, four times.
Q. Okay. Total four times?
A. In the drive-thru. He did come into the lobby of the bank too.
Q. Okay. Tell us about when he would come into the lobby of the bank what would happen.
A. He would walk in and walk up to the table and kind of look at where I was at, and then wait for my teller line to be open, then approach mine. Then I would have one of the tellers come and take my spot and I would exit.
Q. How many times do you recall that happening during the time that you were working there?
A. Like three.
Q. Okay. How do you know . .. that it just wasn't the line that was open for him to conduct business at your teller window?
A. Because there was always more than one teller. I was just the one who filled in when the lines were long. And there would be other tellers open at that time when he would approach my window.
Q. Okay. When this was occurring, how did you feel when you saw the defendant at [your workplace]?
A. I was terrified.
Q. Why is that?
A. Because it put me back to when I was a little girl. I mean, I was afraid. He wore the same uniform that he *14 did — I mean, when he molested me, that he did when he came to [my workplace],
¶ 12. Many years after the alleged sexual assaults and stalking by Lynch took place, the State charged Lynch with three counts of first-degree sexual assault of a child[11] and three counts of stalking.[12], [13]
*15 ¶ 13. Prior to trial, Lynch filed a Shiffra / Green motion, seeking to subpoena the complainant's "psychiatric, psychological, counseling, therapy and clinical records" from 1993-2011 for in camera review. Lynch claims that the complainant's treatment records will likely contain information related to his defense. More specifically, Lynch contends the records will show that (1) the complainant exhibits ongoing symptoms of post traumatic stress disorder, which he argues affects her memory; (2) the complainant did not report Lynch to any treatment providers as a child; and (3) the complainant has sociopathic personality disorder, a symptom of which is frequent lying.
¶ 14. The circuit court granted Lynch's motion for in camera review of the complainant's privileged mental health treatment records. It ordered the complainant to disclose "the names and addresses of all of her treatment providers since January 1, 1980." It then stated, "By treatment providers, the [c]ourt is talking about physicians, psychologists, psychiatrists, and other forms of therapists engaged in any form of counseling with [the complainant] up to the present time." (Emphasis added.) The court further ordered that if the complainant failed to release these records to the court, it would, pursuant to the remedy contained in Shiffra / Green, bar her testimony at trial.
¶ 15. The complainant refused to surrender her privileged mental health treatment records "[u]nless and until" the circuit court's determination was reviewed by another court. As a consequence, the court barred her from testifying against Lynch at trial. The State filed an appeal.
¶ 16. The court of appeals affirmed. State v. Lynch, 2015 WI App 2, 359 Wis. 2d 482, 859 N.W.2d 125. The court of appeals agreed with the circuit *16 court's finding that Lynch had met the showing required by Shiffra/Green.[14] The court further agreed "with the circuit court that, under ShiffraflGreen], the only available remedy when a victim refuses to disclose records for an in camera review is the exclusion of the victim's testimony at trial." Id., ¶ 1. As a result, the court of appeals remanded for further proceedings. The State filed a petition for review to this court, and we granted the State's petition.[15]
II. DISCUSSION
¶ 17. We begin by briefly discussing the difference between privilege and confidentiality, and the two statutes involved in this case: Wis. Stat. § 905.04 (privilege statute) and Wis. Stat. § 146.82 (confidentiality statute). We then explain why it was improper for the Shiffra / Green court to rely on Ritchie when it created a right to access privileged information via a *17 motion for in camera review. Next, we discuss why Shiffra/ Green's right to access privileged information via a motion for in camera review cannot be grounded in any other legal basis, specifically any other constitutional provision. We note that even if there were a right, that right would need to be balanced against § 905.04, the privilege statute. We would analogize this case, which involves access to information, to situations involving the presentation of evidence at trial. A series of opinions from the Supreme Court of the United States instruct that when a defendant seeks to present evidence at trial and is barred by statute from doing so, a court may strike down the statute only when it is arbitrary or disproportionate to the purpose the statute is designed to serve. Here, the privilege statute is neither arbitrary nor disproportionate to the purpose it was designed to serve. Finally, we end by discussing a few ways defendants can meaningfully present a defense without having access to a complainant's privileged mental health treatment records.
A. STANDARD OF REVIEW
¶ 18. This case requires us to interpret and apply the United States Constitution and the Wisconsin Constitution as well as various statutes. "The interpretation of a constitutional provision is a question of law that we review de novo." Appling v. Walker, 2014 WI 96, ¶ 17, 358 Wis. 2d 132, 853 N.W.2d 888. "The interpretation and application of a statute present questions of law that this court reviews de novo while benefitting from the analyses of the court of appeals and circuit court." State v. Alger, 2015 WI 3, ¶ 21, 360 Wis. 2d 193, 858 N.W.2d 346.
*18 B. PRIVILEGE AND CONFIDENTIALITY
¶ 19. Two statutes, one relating to privilege and one relating to confidentiality, are relevant to the present case. Wisconsin Stat. § 905.04 protects a person's information by making that information privileged: "A patient has a privilege to refuse to disclose and to prevent any other from disclosing confidential communications made or information obtained or disseminated for purpose of diagnosis or treatment. . . ." In contrast, Wis. Stat. § 146.82 protects information by making it confidential: "All patient health care records shall remain confidential." We must be mindful of the difference between privileged information and confidential information:
Although they are separate concepts, the terms privilege and confidentiality are often confused. Privilege is an exception to the general rule that the public has a right to every man's evidence. Confidentiality is an ethic that protects the client from unauthorized disclosure of information about the client by the therapist .... The presence of confidentiality alone is not enough to support a privilege. Refusal by a professional to testify in the absence of a privilege may result in a charge of contempt of court against the professional, while a breach of confidentiality may be the subject of a tort action. Confidentiality, therefore, is a professional duty to refrain from speaking about certain matters, while privilege is a relief from the duty to speak in court proceedings.
Catharina J.H. Dubbelday, Comment, The Psychotherapist-Client Testimonial Privilege: Defining the Professional Involved, 34 Emory L.J. 777, 780-81 (1985) (quotation marks and footnotes omitted).
*19 C. THE COURT OF APPEALS IMPROPERLY RELIED ON RITCHIE WHEN IT INVENTED A RIGHT TO ACCESS PRIVILEGED INFORMATION VIA A MOTION FOR IN CAMERA REVIEW.
¶ 20. Since much of this case revolves around the Supreme Court of the United States’ decision in Ritchie, we begin by reviewing its facts and holding. We then discuss the court of appeals' treatment of Ritchie in the two cases leading up to Shiffra as well as Shiffra.
1. The Original In Camera Review Case: Pennsylvania v. Ritchie.
¶ 21. In Ritchie, the Supreme Court addressed whether and to what extent a state's interest in the confidentiality of its investigative files concerning child abuse must yield to a criminal defendant's Sixth and Fourteenth Amendment rights. Ritchie, 480 U.S. at 42-43. In that case, Pennsylvania created "a protective service agency charged with investigating cases of suspected mistreatment and neglect."[16] Id. at 43 (emphasis added). The defendant was charged with "rape, involuntary deviant sexual intercourse, incest, and the corruption of a minor." Id. The alleged victim of those charges was the defendant's thirteen-year-old daughter. Id. The daughter claimed that she had been assaulted by the defendant two or three times per week over a four year period. Id. After reporting the incidents to the police, the case was referred to the protective agency. Id.
¶ 22. Prior to trial, the defendant served the protective agency with a subpoena; he sought access to *20 the agency's records concerning his daughter. Id. The protective agency refused to turn over the records, claiming that the records were protected from disclosure under Pennsylvania law. Id. The relevant Pennsylvania statute provided,
reports made pursuant to this act including but not limited to report summaries of child abuse . .. and written reports ... as well as any other information obtained, reports written or photographs or x-rays taken concerning alleged instances of child abuse in the possession of the department, a county children and youth social service agency or a child protective service shall be confidential and shall only be made available to:
[[Image here]]
(5) A court of competent jurisdiction pursuant to a court order.
Id. at n.2 (first two alterations in original) (emphasis added); see also id. at 43-44. To summarize, the statute required that all reports and information obtained in the course of a protective agency's investigation be kept confidential unless a court ordered disclosure.
¶ 23. The defendant in Ritchie argued that he was entitled to the confidential information because it might contain the names of favorable witnesses as well as exculpatory information. See id. at 55. Moreover, he claimed that the protective agency's refusal to disclose the confidential information violated his constitutional rights, specifically his Sixth Amendment rights to Confrontation and Compulsory Process and his Fourteenth Amendment right to Due Process. See id. at 51-52, 55-56, 57 — 58. The Court rejected the defendant's arguments under the Sixth Amendment and *21 instead addressed his arguments under the Fourteenth Amendment. Id. at 56 ("[B]ecause our Fourteenth Amendment precedents addressing the fundamental fairness of trials establish a clear framework for review, we adopt a due process analysis for purposes of this case.").
¶ 24. In conducting its due process analysis, the Court relied exclusively on Brady v. Maryland, 373 U.S. 83 (1963), the case that first established a prosecutor's disclosure obligation, and cases that clarify Brady. Indeed, the first sentence of the Court's due process analysis reads, "It is well [-] settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." Id. at 57 (emphasis added). The Court then cited to Brady and United States v. Agurs, 427 U.S. 97 (1976), a case that clarified Brady's reach. Id. In fact, the only law cited in the Court's due process analysis stems directly from Brady. Id. at 57-58.
¶ 25. Brady requires, as a prerequisite to disclosure, that the information sought by the defendant be (1) in the prosecutor's possession and (2) both favorable to the accused and material to guilt or punishment. 373 U.S. at 87; see also Ritchie, 480 U.S. at 57. The Ritchie Court readily concluded that the first Brady requirement — that the information be in the prosecutor's possession — was met, so it dove straight into the second requirement — that the information be favorable to the accused and material to guilt or punishment. Ritchie, 480 U.S. at 57. It is clear the Ritchie Court assumed that Brady's disclosure requirement applied to a state agency involved in investigating the allegations as part of the prosecutorial state function because the Court made quick-work of that *22 requirement. In contrast, the Court grappled with Brady's materiality requirement:
At this stage, of course, it is impossible to say whether any information in the [protective agency's] records may be relevant to [the defendant's] claim of innocence, because neither the prosecution nor defense counsel have seen the information, and the trial judge acknowledged that he had not reviewed the full file. The Commonwealth, however, argues that no materiality inquiry is required, because a statute renders the contents of the file [confidential]. Requiring disclosure here, it is argued, would override the Commonwealth's compelling interest in confidentiality on the mere speculation that the file "might" have been useful to the defense.
Id. (emphasis added).
¶ 26. In considering how Brady's materiality standard should apply to speculative, protected information, the Court balanced the defendant's interest in the information against the State's interest in protecting the information:
Although we recognize that the public interest in protecting this type of sensitive information is strong, we do not agree that this interest necessarily prevents disclosure in all circumstances. This is not a case where a state statute grants [the protective agency] the absolute authority to shield its files from all eyes. Rather, the [state] law provides that the information shall be disclosed in certain circumstances, including when [the protective agency] is directed to do so by court order. Given that the [state] Legislature contemplated some use of [the protective agency's] records injudicial proceedings, we cannot conclude that the statute prevents all disclosure in criminal prosecutions. In the absence of any apparent state policy to the contrary, we therefore have no reason to believe that relevant *23 information would not be disclosed when a court of competent jurisdiction determines that the information is "material" to the defense of the accused.
Id. at 57-58 (emphases added) (citation omitted). Accordingly, the Ritchie Court held that the defendant was entitled to have the protective agency's investigative file reviewed in camera, remarking that if the files "contain[ed] information that probably would have changed the outcome of his trial," then "[the defendant] must be given a new trial." Id. at 58. Thus, the point of the in camera review was to determine whether the files met Brady's second requirement— materiality.
¶ 27. In sum, there are two key takeaway points from Ritchie. First, Ritchie involved a state statute that made the protective agency's investigative files confidential. But the statute specifically allowed for disclosure per a court order. The Court leaned heavily on this fact in reaching its conclusion, commenting, "the [state] law provides that the information shall be disclosed in certain circumstances, including when [the agency] is directed to do so by court order." Id. at 57-58.
¶ 28. Second, the protective agency, the entity holding the records, was responsible for "investigating cases of suspected mistreatment and neglect," including the allegations made against the defendant in that case. Id. 42-43. The Ritchie Court considered the "investigative" status of the protective agency important because it cited exclusively to Brady and post-jBrady cases, which require the prosecutor to turn over files in his or her possession. The Ritchie Court's actions (summarily skipping over this requirement) demonstrate that the protective agency met Brady's *24 possession requirement because the protective agency performed state investigative and prosecutorial functions.
¶ 29. And this conclusion makes sense. Since Brady, the Court has held that the prosecutor's Brady obligation extends to "others acting on the government's behalf in the case, including the police." See Kyles v. Whitley, 514 U.S. 419, 437 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." (emphasis added)); Strickler v. Greene, 527 U.S. 263, 281 (1999) ("In order to comply with Brady, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.' " (citing Kyles, 514 U.S. at 437)). In Ritchie, the state statute charged the relevant protective agency with "investigating cases of suspected mistreatment and neglect." 480 U.S. at 43. There, in particular, the defendant's case was "referred" to the protective agency. Id. In short, it made sense for the Supreme Court to rely on Brady and post-Brady cases in Ritchie because the protective agency was charged with investigating the allegations and was, therefore, acting on the prosecution's behalf. As a result, any material it had was constructively within the possession of the prosecution.
2. Our Court of Appeals Gradual Expansion of Ritchie: In the Interest of K.K.C., State v. S.H., and State v. Shiffra.
¶ 30. Nearly one year after the Supreme Court of the United States decided Ritchie, our court of appeals took up In the Interest of K.K.C., 143 Wis. 2d 508, 422 *25 N.W.2d 142 (Ct. App. 1988). The court reached the following conclusion regarding Ritchie:
[The defendant] contends that if the trial judge in his criminal case does not review the agency's files, he will be denied his constitutional rights to confrontation, compulsory process, and due process. Ritchie holds that a criminal defendant is entitled to an in camera review by the trial court of confidential records if those records are material to the defendant's defense.
[The defendant] has not moved the trial court in his criminal case to make an in camera review of the agency records. If he does so, Ritchie, supra, establishes that he is entitled to such a review by the trial court, provided he makes a preliminary showing that the files contain evidence material to his defense.
In the Interest of K.K.C., 143 Wis. 2d 508, 511, 422 N.W.2d 142 (Ct. App. 1988) (citations omitted). That's the court's entire Ritchie analysis.
¶ 31. The statute in K.K.C., Wis. Stat. § 48.78(2)(a), provided, "No agency may make available for inspection or disclose the contents of any record kept or information received about any individual in its care or legal custody, except as provided [under other subsections] or hy order of the court." Id. at 509-10. Similar to the statute in Ritchie, § 48.78(2)(a) carved out a court order exception. However, unlike in Ritchie, it is unclear whether the County Department of Social Services was "investigating" or "acting on the government's behalf' by assisting the prosecution.
¶ 32. Two years later, the court of appeals decided State v. S.H., 159 Wis. 2d 730, 465 N.W.2d 238 (Ct. App. 1990). There, the court once again interpreted Ritchie, this time broadly expanding Ritchie's *26 reach. In S.H., the State charged the defendant with twelve counts of first-degree sexual assault. State v. S.H., 159 Wis. 2d 730, 733, 465 N.W.2d 238 (Ct. App. 1990). The alleged victims of those charges were the defendant's three children. Id. Prior to trial, the defendant sought a court order directing the children's counseling center (Directions Counseling Center) to provide him with copies of the children's treatment records. Id. at 734. The counseling center refused to release the records after the children's guardian ad litem claimed the psychologist-patient privilege (Wis. Stat. § 905.04) on behalf of the children. Id. The court of appeals, citing Ritchie and K.K.C., concluded that "if a defendant makes a preliminary showing that the records contain evidence material to his defense, he is entitled to an in camera review by the trial court of those records." Id. at 738. Here is the court of appeals' analysis and application of Ritchie:
[Ritchie] controls S.H.'s constitutional right to compel disclosure of confidential records. That [C]ourt conducted a due process analysis and concluded that the defendant was entitled to an in camera review by the trial court of confidential records. In Ritchie, the Court struck a balance between the protection of confidential information and the defendant's interest in obtaining exculpatory information. The Court recognized that an in camera review denied the defendant the benefit of an "advocate's eye." However, such review adequately protected the defendant's rights while protecting the confidentiality of the records. Accordingly, if a defendant makes a preliminary showing that the records contain evidence material to his defense, he is entitled to an in camera review by the trial court of those records.
Id. at 737-38 (citations omitted). The court of appeals left out some of Ritchie's crucial features.
*27 ¶ 33. For example, unlike in Ritchie and K.K.C., where the records sought were confidential, the records sought in S.H. were privileged under Wis. Stat. § 905.04. Moreover, unlike the statutes in Ritchie and K.K.C., § 905.04 does not contain an exception allowing for release by court order.
¶ 34. Additionally, in S.H., a private mental health facility, Directions Counseling Center, held the privileged records. Id. at 733-34. Unlike the protective agency in Ritchie, no facts in the court of appeals' opinion would suggest that Directions Counseling Center was involved in "investigating" the sexual assault allegations or was in any way acting on behalf of the prosecutor. In reaching its conclusion, the court of appeals failed to take notice of these important distinguishing features. Instead, the court incorrectly interpreted Ritchie to mean "that the defendant was entitled to an in camera review by the trial court of confidential records." Id. at 737-38.
¶ 35. Almost three years later, the court of appeals considered State v. Shiffra, 175 Wis. 2d 600, 499 N.W.2d 719 (Ct. App. 1993). In Shiffra, the state charged the defendant with second-degree sexual assault. 175 Wis. 2d at 602. Prior to trial, the defendant moved for an order requiring the complainant to reveal to the defendant her "psychiatric history, psychiatric records, and to execute an authorization to release medical information from any doctors, hospitals or counselors seen by [the complainant] . . . ." Id. at 603. The State opposed the motion, arguing that the complainant's records were privileged under Wis. Stat. § 905.04. Despite the State's argument that "th[e] case d[id] not fall within the ambit of Ritchie because [the *28 complainant's] records [were] not in the possession of the prosecution or any other state agency," the court concluded,
We are bound by Wisconsin precedent, which clearly makes Ritchie applicable to cases in which the information sought by the defense is protected by statute and is not in the possession of the state. See K.K.C., 143 Wis. 2d at 511, 422 N.W.2d at 144 (information sought was confidential); S.H., 159 Wis. 2d at 736, 465 N.W.2d at 240-41 (information sought was protected under sec. 905.04, Stats., and was in the possession of a private counseling center). According to these cases, Shiffra is entitled to an in camera inspection if he meets the burden of making a preliminary showing of materiality. The State contends that S.H. and K.K.C. are not binding because their relevant language is dicta. We do not agree. Both cases unequivocally adopted Ritchie as the law in Wisconsin even when the records are not in the state's possession.
Id. at 606-07.
¶ 36. To say the court of appeals took some liberties interpreting and applying Ritchie would be an understatement. Over the course of three cases, K.K.C., S.H., and Shiffra, the court of appeals swept into Ritchie's reach privileged records held by entities completely removed from the investigative criminal process. Ritchie — a case concerning confidential records (subject to numerous exceptions) held by the very agency charged with investigating the offense and therefore soundly rooted in Brady — never should have been stretched to cover privileged records held by agencies far removed from investigative and prosecu-torial functions. As a result, we conclude that the court of appeals improperly relied on Ritchie when it created *29 a right to access privileged information that is not in the prosecutor's hands via a motion for in camera review.
3. This Court's Adoption of Shiffra.
¶ 37. This court appears to have first "adopted" the court of appeals' Shiffra test in State v. Solherg, 211 Wis. 2d 372, 564 N.W.2d 775 (1997). We use the term "adopted" loosely because the Solherg court simply parroted Shiffra's test and then cited Shiffra:
Whether the court of appeals had the authority to examine E.H's records is dependent on whether the circuit court appropriately conducted an in camera inspection of the records. If the circuit court had the authority to review the privileged records, then the court of appeals also had the authority to do so. A circuit court should conduct an in camera review of privileged medical records when the defendant makes "a preliminary showing that the sought-after evidence is material to his or her defense," and the privilege holder consents to review of those records.
State v. Solherg, 211 Wis. 2d 372, ¶ 16, 564 N.W.2d 775 (1997) (footnote omitted) (quoting Shiffra, 175 Wis. 2d at 605). The Solherg court's singular string of reasoning for such a rule was its "belie [f] that giving the defendant an opportunity to have the circuit court conduct an in camera review of the privileged records, while still allowing the patient to preclude review, addresse[d] both the interests of the defendant and the patient." Id., ¶ 23. In essence, Shiffra seemed fair enough to the Solherg court.
¶ 38. We also considered Shiffra in State v. Rizzo, 2002 WI 20, 250 Wis. 2d 407, 640 N.W.2d 93. Similar to the court in Solherg, the Rizzo court applied Shiffra *30 without any analysis of Shiffra or its foundation. Here is the Rizzo court's application of Shiffra:
We do no adopt Rizzo's position because it would eviscerate the procedure for in camera review set forth in Shiffra, which protects a victim's confidential records. In effect, Rizzo's position would provide that the defendant must receive full access to the victim's treatment records in every case in order to effectively cross-examine an expert who treated the victim. That is in stark contrast to the in camera procedure under Shiffra, which specifically balanced the victim's interest in confidentiality against the constitutional rights of the defendant.
State v. Rizzo, 2002 WI 20, ¶ 53, 250 Wis. 2d 407, 640 N.W.2d 93 (citing Shiffra, 175 Wis. 2d at 609-10).
¶ 39. Finally, in State v. Green, this court modified Shiffra's standard for obtaining an in camera review. The Green court's consideration of whether Shiffra was good law is as follows:
The State contends that the holding in [Shiffra] was in error because it relied on [Ritchie]. The State argues that Ritchie was distinguishable and therefore inapplicable because it involved a situation, unlike here, where the records were in the government's possession. The Shiffra court, however, specifically rejected this argument, concluding that it was bound by Wisconsin precedent, which clearly made Ritchie applicable in cases where the information sought by the defense is not in the possession of the state. Shiffra, 175 Wis. 2d at 606-07, 499 N.W.2d 719 (citing State v. S.H., 159 Wis. 2d 730, 736, 465 N.W.2d 238 (Ct. App. 1990), and In re K.K.C., 143 Wis. 2d 508, 511, 422 N.W.2d 142 (Ct. App. 1988)). This court recognized the validity of Shiffra in [Solberg] and [Rizzo]. We will not depart from this precedent.
*31 Green, 253 Wis. 2d 356, ¶ 21 n.4.[17] To put it bluntly, Shiffra kept the balancing test invented by the court of appeals in S.H. and K.K. C. because it felt "bound by precedent," and this court kept Shiffra because Sol-berg and Rizzo appeared to apply it. This is the untenable foundation upon which Shiffra was built and now rests. We will not rubber stamp the Shiffra test solely because it has been inexplicably applied.[18] We therefore undertake to consider whether there is any legal basis in which Shiffra can properly be grounded.[19]
*34 D. NEITHER THE SIXTH AMENDMENT NOR THE FOURTEENTH AMENDMENT GUARANTEE A DEFENDANT THE RIGHT TO ACCESS PRIVILEGED INFORMATION VIA A MOTION FOR IN CAMERA REVIEW.
¶ 40. We turn now to discuss whether there is any other legal basis for creating a right to access privileged information via a motion for in camera review. An analysis of other cases tackling this topic reveals that defendants have consistently argued that three constitutional provisions — the Sixth Amendment's Confrontation Clause and Compulsory Process Clause and the Fourteenth Amendment's Due Process Clause — give rise to a right to access privileged information via a motion for in camera review. See, e.g., Indiana v. Fromme, 949 N.E.2d 789, 795 (Ind. 2011). Each provision will be discussed in turn below.
1. The Sixth Amendment's Confrontation Clause.
¶ 41. The United States Constitution provides, "In all criminal prosecutions the accused shall enjoy the right... to be confronted with witnesses against him . . . ." U.S. Const. amend. VI.[20] The Supreme Court of the United States has explained, "The Confrontation Clause provides two types of protections for *35 a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination. Ritchie, 480 U.S. at 51 (plurality opinion).[21]
¶ 42. A plurality of the Supreme Court has specifically considered — and rejected — the argument that "by denying [a defendant] access to the information necessary to prepare his defense, the trial court interfered with [a defendant's] right of cross-examination." Id. In Ritchie, the Court commented on the limited nature of a defendant's right to cross-examination: "The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." Id. at 53. Moreover, the Court went on to add, "If we were to accept this broad interpretation . . . , the effect would be to transform the Confrontation Clause into a constitutionally compelled rule of pretrial discovery. Nothing in the case law supports such a view. The opinions of this Court show that the right to confrontation is a trial right. . . ." Id. at 52 (first emphasis added). Thus, the right to cross examine witnesses is satisfied when "defense counsel receives wide latitude at trial to question witnesses." Id. at 53 n.9 ("[T]he Confrontation Clause only protects a defendant's trial rights [; it] does not compel the pretrial production of information that might be useful in preparing for trial.").
¶ 43. Similar to the defendant in Ritchie, Lynch's argument would be that the court interfered with his *36 ability to most effectively cross examine the complainant by denying him access to the complainant's privileged mental health treatment records. A plurality of the Supreme Court has already rejected this argument, and we reject this argument now. Lynch's right to cross examination will be satisfied so long as he has the opportunity to cross examine the complainant at trial.
2. The Sixth Amendment's Compulsory Process Clause.
¶ 44. The United States Constitution provides, "In all criminal prosecutions the accused shall enjoy the right... to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI.[22] The Supreme Court of the United States has explained that the Compulsory Process Clause grants a defendant the "right to offer the testimony of witnesses, and to compel their attendance, if necessary . . . ." Washington v. Texas, 388 U.S. 14, 19 (1967); see also Ritchie, 480 U.S. at 56 (majority opinion) ("Our cases establish, at a minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." (emphasis added)).
¶ 45. In State v. Schaefer, 2008 WI 25, 308 Wis. 2d 279, 746 N.W.2d 457, we analyzed the Ritchie Court's treatment of the Compulsory Process Clause, specifically taking notice of the Supreme Court's "re- *37 luctan[ce] to establish an unconditional discovery right under the Sixth Amendment." Id., ¶ 66. In Ritchie, the Court reiterated that it "has never squarely held that the Compulsory Process Clause guarantees the right to discover the identity of witnesses, or to require the government to produce exculpatory evidence." Ritchie, 480 U.S. at 56 (emphasis omitted). Consequently, the Court chose to forego a Sixth Amendment analysis and instead opted for a Fourteenth Amendment Due Process analysis. Id. It explained, "Although we conclude that compulsory process provides no greater protections in this area than those afforded by due process, we need not decide today whether and how the guarantees of the Compulsory Process Clause differ from those of the Fourteenth Amendment." Id. In Schaefer, we interpreted the Court's statement in Ritchie to mean that "unless due process required defense access to specific evidence, the Compulsory Process Clause cannot provide substitute authority for such access." Schaefer, 308 Wis. 2d 279, ¶ 66. Following the Supreme Court's lead, we move on to consider whether the Due Process Clause guarantees a defendant the right to access privileged information via a motion for in camera review.[23]
*38 3. The Fourteenth Amendment's Due Process Clause.
¶ 46. The United States Constitution provides, "No State shall. . . deprive any person of life, liberty or property, without due process of law . . . ." U.S. Const, amend. XIV.[24] Due Process requires that criminal prosecutions comport with "prevailing notions of fundamental fairness." California v. Trombetta, 467 U.S. 479, 485 (1984). Fundamental fairness necessitates that "criminal defendants be afforded a meaningful opportunity to present a complete defense." Id. However, the right to present a complete defense has never been interpreted to include a general right to access (or discover) information in a criminal case. To the contrary, the Supreme Court has consistently recognized that "there is no general constitutional right to discovery in a criminal case . . . ." Ritchie, 480 U.S. at 59-60 (quoting Weatherford v. Bursey, 429 U.S. 545, 559 (1977)).
¶ 47. We too have held that there is no general constitutional right to access information in criminal cases. See State v. Miller, 35 Wis. 2d 454, 151 N.W.2d *39 157 (1967); see also Britton v. State, 44 Wis. 2d 109,170 N.W.2d 785 (1969) ("Discovery has been left to rule-making power and has not been deemed a constitutional issue."). Accordingly, a defendant is entitled to access information only to the extent outlined in Wis. Stat. § 971.23, our criminal discovery statute. Schaefer, 398 Wis. 2d 279, ¶ 77 n.17 ("[T]he scope of discoverable materials is set out in statute and compliance with the statute will be enforced by the court."); see also Miller, 35 Wis. 2d at 474 ("[I]t has been held that unless introduced by appropriate legislation, the doctrine of discovery is a complete and utter stranger to criminal procedure." (quoting 23 C.J.S. Criminal Law § 955(1), p. 787)).[25]
¶ 48. Of course, "[statutory discovery is conceptually distinct from the prosecution's constitutionally-mandated duty to disclose exculpatory evidence" under Brady. 9 Wis. Prac., Criminal Practice & Procedure § 22:1 (2d ed.); see also Miller, 35 Wis. 2d at 474-78; Britton, 44 Wis. 2d at 117-18; Schaefer, 308 Wis. 2d 279, ¶¶ 22-23. In Britton, we explained,
*40 A distinction must be made between "disclosure" and "discovery." Discovery emphasizes the right of the defense to obtain access to evidence necessary to prepare its own case, while disclosure concerns itself with the duty of the prosecution to make available to the accused evidence and testimony which, as a minimum standard, is exculpatory based on constitutional standards of due process. Discovery has been left to rule-making power and has not been deemed a constitutional issue. On the other hand, disclosure, or the failure to disclose, is a constitutional issue to be decided on a case by case basis ....
Britton, 44 Wis. 2d at 117-18 (emphasis added).
¶ 49. A prosecutor's constitutionally-mandated duty to disclose arises out of the Supreme Court of the United States’ decision in Brady. In Brady, the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87 (emphasis added). The Court reasoned, "A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice . . . ." Id. at 87-88 (emphasis added). Stated otherwise, a defendant is treated unfairly when a prosecutor hides favorable evidence from a defendant.
¶ 50. The Supreme Court of the United States has consistently limited Brady's disclosure requirement to the prosecutor and to others acting on the prosecutor's behalf. See Kyles, 514 U.S. at 437 ("[T]he *41 individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." (emphasis added)); Strickler, 527 U.S. at 281 ("In order to comply with Brady, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in this case, including the police.'" (citing Kyles, 514 U.S. at 437)). For example, in Pitonyak v. Stephens, 732 F.3d 525 (5th Cir. 2013), the Fifth Circuit, recognizing Brady's limitation, held that the prosecution's Brady requirement did not extend to "a jail counselor" because the counselor was "not involved in investigating or preparing the case against [the defendant]." Id. at 531, 533.
¶ 51. And in Illinois v. C.J., 652 N.E.2d 315 (Ill. 1995), the Supreme Court of Illinois held that "where [the Division of Child Family Services] acts at the behest of and in tandem with the State's Attorney, with the intent and purpose of assisting the prosecutorial effort, DCFS functions as an agent of the prosecution," and is therefore subject to Brady's disclosure requirement. Id. at 318. However, because "there was no evidence to support the conclusion that the DCFS investigator [there] functioned, intentionally or otherwise, as an aid in the prosecution of the case," the prosecutor's Brady requirement did not extend to that particular DCFS agent. Id.
¶ 52. For comparison, in Commonwealth v. Bing Sial Liang, 747 N.E.2d 112 (Mass. 2001), the Supreme Judicial Court of Massachusetts held that a victim advocate's notes fell within the prosecutor's Brady requirement because "[a]dvocates are included in the statute's definition of 'prosecutor' and generally are employees of the prosecution." Id. at 116. The Court *42 went on to say, "advocates are paid by the various district attorney[s'] offices [and] work closely with the prosecutors developing cases.' Clearly the Legislature views advocates as part of the prosecution team." Id. (alterations in original) (citations omitted).
¶ 53. Notably, both the Seventh and Eighth Circuits have rejected defendants' attempts to subpoena treatment records in preparation for trial despite the defendants' assertions that withholding the information would deprive them of a fair trial. United States v. Hach, 162 F.3d 937 (7th Cir. 1998); United States v. Skorniak, 59 F.3d 750 (8th Cir. 1995). In Hach, the defendant sought a witness's "medical and psychiatric records for purposes of conducting an in camera review, and ultimately to release them to him for use in cross-examination." 162 F.3d at 946. In denying the defendant's request, the Seventh Circuit noted,
[The defendant's] attempt to bootstrap onto Ritchie suffers from a grave]] problem — the evidence is not and never was in the government's possession. As the Eighth Circuit noted in United States v. Skorniak, a failure to show that the records a defendant seeks are in the government's possession is fatal to the defendant's claim. ... [I]f the documents are not in the government's possession, there can be no "state action" and consequently, no violation of [the] Fourteenth Amendment.
Id. at 947 (emphasis added). Simply, because the records were not held by the prosecutor or an entity acting on behalf of the prosecutor, the defendant was not entitled to disclosure of the records.
¶ 54. To summarize, a defendant has a right to present a meaningful defense, but this right is not limitless. It does not include a constitutional right to access privileged information via a motion for in cam *43 era review. Discovery is purely statutory; accordingly, a defendant's right to obtain information is to be found in Wis. Stat. § 971.23. In contrast, a defendant has a constitutional right, under Brady, to material information but only when that information is held by the prosecutor, including others acting on the prosecutor's behalf. Outside of the prosecution's limited disclosure requirement, there is no constitutional right to access information. Weatherford, 429 U.S. at 559 ("There is no general constitutional right to discovery in a criminal case, and Brady did not create one.").
¶ 55. Here, there is nothing to show that the complainant's private mental health facility was acting on behalf of the prosecutor. Unlike in Ritchie and Bing Sial Ling, the complainant's mental health facility was not statutorily created for the purpose of "investigating" crime. Additionally, there are no facts in the record that would indicate that the facility was acting on behalf of or in tandem with the prosecutor. Consequently, this case does not implicate Brady. In sum, Lynch has no right to access the complainant's privileged treatment information via a motion for in camera review because there is no constitutional right to access information and because the information does not fall under Brady's, limited disclosure obligation.[26]
*44 E. EVEN IF THERE WERE A RIGHT TO ACCESS PRIVILEGED INFORMATION VIA A MOTION FOR IN CAMERA REVIEW, THAT RIGHT WOULD NEED TO BE BALANCED AGAINST WIS. STAT. § 905.04, THE PRIVILEGE STATUTE.
¶ 56. We have concluded that a defendant has no Sixth or Fourteenth Amendment right to access privileged information via a motion for in camera review. However, even if there were such a right, that right would still need to be balanced against Wis. Stat. § 905.04, the privilege statute. We would analogize this case, which involves access to information, to cases involving the presentation of evidence at trial. We do so because even if a defendant cannot gain pre-trial access to information, the defendant may still seek to present evidence (in the form of the complainant's testimony) at trial. See Goldsmith v. State, 651 A.2d 866, 874 (Md. 1995) (distinguishing between a defendant's right of access to information during pre-trial discovery and a defendant's right at trial to present a defense).
¶ 57. The Supreme Court of the United States has recognized "the right of the defendant to present evidence." Taylor v. Illinois, 484 U.S. 400, 409 (1988) (emphasis added). In Washington v. Texas, 388 U.S. 14 (1967), the Court stated,
The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right *45 to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.
Id. at 19. However, the Court has also recognized that a defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor, 484 U.S. at 410 (emphasis added). Accordingly, a defendant's right to present evidence must be balanced against other considerations. See Rock v. Arkansas, 483 U.S. 44, 55-56 (1987) ("Of course, the right to present relevant testimony is not without limitation. The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' " (quoting Chambers v. Mississippi, 410 U.S. 284, 295 (1973)).
¶ 58. Over a series of cases,[27] the Supreme Court has developed a test for determining when a defendant's right to present evidence is violated: "[T]he *46 exclusion of defense evidence abridge [s] an accused's right to present a defense 'where the restriction is arbitrary or disproportionate to the purposes' [it is] designed to serve, and the evidence implicate [s] a sufficiently weighty interest of the accused." Harris v. Thompson, 698 F.3d 609, 626 (7th Cir. 2012) (alterations in original) (quoting United States v. Scheffer, 523 U.S. 303, 308-09 (1998) (quoting Rock, 483 U.S. at 56)).
¶ 59. For instance, in Washington v. Texas, the Court struck down a state statute that barred the introduction of an alleged accomplice's testimony. In declaring the statute unconstitutional, the Court called the rule "arbitrary," specifically commenting that "[t]he rule disqualifying an alleged accomplice from testifying on behalf of the defendant cannot even be defended on the ground that it rationally sets apart a group of persons who are particularly likely to commit perjury." Washington v. Texas, 388 U.S. at 22 (emphasis added). Accordingly, the Court held that the statute "arbitrarily denied [the defendant] the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." Id. at 23 (emphasis added). In a footnote, the Court was careful to clarify that "[n]othing in [its] opinion should be construed as disapproving testimonial privileges,. . . which are based on entirely different considerations . . . ." Id. at 23 n.21.
¶ 60. Chambers v. Mississippi serves as another example. In Chambers, the Court analyzed Mississippi's common-law rule that "a party may not impeach *47 his own witness." 410 U.S. at 295. The Court evaluated the basis for such a rule: "The rule rests on the presumption — without regard to the circumstances of the particular case — that a party who calls a witness 'vouches for his credibility.' " Id. at 295 (citation omitted). As part of its analysis, the Court remarked that the rule had been condemned by other sources as "archaic, irrational, and potentially destructive of the truth-gathering process." Id. at 296 n.8. Moreover, the Court took notice of the fact that "Mississippi ha[d] not sought to defend the rule or explain its rationale. Nor ha[d] it contended that its rule should override the accused's right of confrontation." Id. at 297. As a result, the Court concluded that the State's rule denied the defendant an opportunity to present a complete defense. Id. at 302-03.
¶ 61. To summarize, the "mere invocation" of a constitutional right "cannot automatically and invariably outweigh countervailing public interests." Taylor, 484 U.S. at 414. Thus, a defendant's right to present a meaningful defense is violated only when a rule or statute infringes upon a "weighty interest of the accused" and is "arbitrary" or "disproportionate to the purpose!] [it is] designed to serve." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quotation marks omitted) (quoting Scheffer, 523 U.S. at 308).
¶ 62. Here, Wis. Stat. § 905.04, the privilege statute, is neither arbitrary nor disproportionate to the purpose it is designed to serve. We have stressed that the "public policy underpinning the privilege is to encourage patients to freely and candidly discuss medical concerns with their physicians by ensuring that those concerns will not unnecessarily be disclosed *48 to a third person." Steinberg v. Jensen, 194 Wis. 2d 439, 459, 534 N.W.2d 361 (1995).[28]
¶ 63. Additionally, the Supreme Court of the United States has recognized a federal psychotherapist privilege. Jaffee v. Redmond, 518 U.S. 1,18 (1996). Throughout its opinion adopting the privilege, the Court strongly emphasized the importance of such a privilege:
Effective psychotherapy, by contrast, depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclose of facts, emotions, memories, and fears. Because of the sensitive nature of the problems for which individuals *49 consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment.
Id. at 10 (emphasis added). Moreover, the Court stressed,
Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evi-dentiary need for disclosure would eviscerate the effectiveness of the privilege. As we explained in [another case], if the purpose of the privilege is to be served, the participants in the confidential conversation "must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all."
Id. at 17-18 (emphasis added) (quoting Upjohn Co. v. United States, 449 U.S. 383, 393 (1981)). In short, Wis. Stat. § 905.04, the privilege statute, serves the crucial purpose of ensuring that individuals — especially individuals who may be suffering as a result of a traumatic experience, like sexual assault — can freely and openly communicate with and be treated by their mental health provider. See United States v. Shrader, 716 F. Supp. 2d 464, 473 (S.D. W. Va. 2010) ("[F]or [this victim] and other alleged stalking victims to have to choose whether to obtain counseling knowing that their alleged stalkers can subpoena the records thereof would be no choice at all. This chilling effect is precisely what the Supreme Court foresaw and explicitly *50 rejected in Jaffee.").[29] Accordingly, § 905.04, the privilege statute, is not arbitrary or disproportionate to the purpose it was designed to serve.
F. THE SIMPLE REMEDY IF THE PEOPLE OF WISCONSIN WANT A BALANCING TEST: HAVE THE LEGISLATURE AMEND WIS. STAT. § 905.04 TO INCLUDE AN EXCEPTION.
¶ 64. Over the years, the Legislature has amended Wis. Stat. § 905.04, the privilege statute, numerous times, so the Legislature can, if it wants, amend § 905.04 to include a Shiffra/Green-like balancing test. Thus, should our interpretation and application of § 905.04 and the Constitution represent an "undesired result, the legislature may rectify the situation" by amending § 905.04 to include a Shiffra/Green-like balancing test as an exception to the general privilege rule. Hamilton v. Hamilton, 2003 WI 50, ¶ 49, 261 Wis. 2d 458, 661 N.W.2d 832.
¶ 65. For example, Iowa's privilege statute contains a Shiffra / Green-like exception to its general privilege rule. Iowa Code § 622.10(4) states,
a. Except as otherwise provided in this subsection, the confidentiality privilege under this section shall be absolute with regard to a criminal action and this section shall not be construed to authorize or require the disclosure of any privileged records to a defendant in a criminal action unless either of the following occur:
*51 (1) The privilege holder voluntarily waives the confidentiality privilege
(2)(a) The defendant seeking access to privileged records under this section files a motion demonstrating in good faith a reasonable probability that the Information sought is likely to contain exculpatory information that is not available from any other source and for which there is a compelling need for the defendant to present a defense in the case. Such a motion shall be filed not later than forty days after arraignment under seal of the court. Failure of the defendant to timely file such a motion constitutes a waiver of the right to seek access to privileged records under this section, but the court, for good cause shown, may grant relief from such a waiver.
(b) Upon a showing of reasonable probability that the privileged records sought may likely contain exculpatory information that is not available from any other source, the court shall conduct an in camera review of such records to determine whether exculpatory information is contained in such records.
(c) If exculpatory information is contained in such records, the court shall balance the need to disclose such information against the privacy interest of the privilege holder.
(d) Upon the court's determination, in writing, that the privileged information sought is exculpatory and that there is a compelling need for such information that outweighs the privacy interest of the privilege holder, the court shall issue an order allowing the disclosure of only those portions of the records that contain the exculpatory information. The court's order shall also prohibit any further dissemination of the information to any person, other than the defendant, the defendants' attorney, and the prosecutor, unless otherwise authorized by the court.
*52 b. Privileged information obtained by any means other than as provided in paragraph "a" shall not be admissible in any criminal action.
In simpler terms, Iowa allows a defendant to make a motion "demonstrating in good faith a reasonable probability that the information sought is likely to contain exculpatory information that is not available from any other source and for which there is a compelling need for the defendant to present a defense in the case." Iowa Code § 622.10(4)(2)(a). If the defendant meets the requisite showing, "the court shall conduct an in camera review of such records to determine whether exculpatory information is contained in such records." Iowa Code § 622.10(4)(2)(b). Should the in camera review of the records reveal exculpatory information, the court must next "balance the need to disclose such information against the privacy interest of the privilege holder." Iowa Code § 622.10(4)(2)(c). If "there is a compelling need for such information that outweighs the privacy interest of the privilege holder," then the court must "issue an order allowing the disclosure of only those portions of the records that contain the exculpatory information." Iowa Code § 622.10(4)(2)(d).
¶ 66. In short, even though there is no constitutional basis for Shiffra / Green, the Legislature could, if it wanted to, give a defendant access to privileged information by following Iowa's lead and amending Wisconsin's privilege statute.[30] See Bostco LLC v. Milwaukee Metro. Sewerage Dist., 2013 WI 78, ¶ 61, 350 *53 Wis. 2d 554, 835 N.W.2d 160 ("When a statute [does not] to address a particular situation, the remedy for the omission does not lie with the courts. It lies with the legislature.").
G. THE OPPORTUNITY TO PRESENT A MEANINGFUL DEFENSE.
¶ 67. Before we conclude, we note that defendants will certainly have an opportunity to present a meaningful defense without having access to privileged information via a motion for in camera review.
¶ 68. First, all defendants are presumed innocent until proven guilty. Taylor v. Kentucky, 436 U.S. 478, 483 (1978) ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." (quoting Coffin v. United States, 156 U.S. 432, 453 (1895)).
¶ 69. Second, all defendants have the right to physically confront and cross-examine witnesses as well as have the right to compel the attendance of witnesses at trial. See Ritchie, 480 U.S. at 51; Washington v. Texas, 388 U.S. at 19.
¶ 70. Third, the prosecutor and those acting on behalf of the prosecution have a constitutionally-mandated duty to disclose to the defendant exculpatory evidence under Brady. See Brady, 373 U.S. at 87.
¶ 71. Fourth, a defendant could call other witnesses and have them testify about the complainant's character for truthfulness. See Wis. Stat. § 906.08 ("Except as provided in s. 972.11(2), the credibility of a witness may be attacked or supported by evidence in the form of reputation or opinion, but subject to the *54 following limitations: (a) The evidence may refer only to character for truthfulness or untruthfulness. . . . ").
¶ 72. Finally, Wisconsin and many other states have mandatory reporting laws. See Wis. Stat. § 48.981(2). These laws mandate that certain persons who have contact with a child report abuse. Id. For example, § 48.981(2m)(c)-(d), requires a "health care provider who provides any health care services to a child" or a "person who obtains information about a child who is receiving or has received health care services from a health care provider" to "report as required ... if he or she has any reason to suspect. . . [t]hat the child, because of his or her age or immaturity, was or is incapable of understanding the nature or consequences of sexual intercourse or sexual contact." A defendant could ask a treatment provider who would have been subject to the mandatory reporting requirement if he or she ever reported the defendant to the authorities. In short, defendants, including Lynch, have many other means by which to cast doubt on a complainant's allegations and the State's case, thereby affording defendants the opportunity to present a meaningful defense.[31]
*56 III. CONCLUSION
¶ 73. To briefly summarize, we conclude that Lynch has no right to access privileged information via a motion for in camera review. Simply put, no constitutional provision affords him such a right. Moreover, even if Lynch had a right, his right would not automatically trump the privilege statute. Rather, his right would need to be balanced against the privilege statute. The Supreme Court of the United States’ balancing test for presentation of evidence cases instructs us to consider whether the statute at hand is arbitrary or disproportionate to the purpose it is designed to serve. Here, the privilege statute is neither arbitrary nor disproportionate as it protects the free flow of open and honest communication between a patient and his or her physician. For these reasons, we would overrule Shiffra/ Green and its progeny.
By the Court. — As a result of a divided court, the law remains as the court of appeals has articulated it.

 State v. Lynch, 2015 WI App 2, 359 Wis. 2d 482, 859 N.W.2d 125.

 The Honorable Andrew R Bissonnette presided.

 Wisconsin's privilege statute provides, "A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment of the patient's physical, mental, or emotional condition .. . ." Wis. Stat. § 905.04(2).

 Throughout this opinion, we use the pronoun "he" when referring to a defendant because the defendant, Lynch, is a male.

 State v. Green, 2002 WI 68, 253 Wis. 2d 356, 646 N.W.2d 298, states the Shiffra/Green test as follows: "[T]he standard to obtain an in camera review requires a defendant to set forth, in good faith, a specific factual basis demonstrating a reasonable likelihood that the records contain relevant information necessary to a determination of guilt or innocence and is not merely cumulative to other evidence available to the defendant." Id., ¶ 19.

 Wisconsin Stat. § 146.82(2)(a)4. (2013 — 14) allows a patient's confidential health care records to be "released upon request without informed consent" "under a lawful order of a court of record."
All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated. Although the acts giving rise to the alleged crimes in this case date back many years, we cite to the most current version of the statutes as no pertinent changes have been made.

 The State's petition for review framed the three issues as follows:
*6 1. Do defendants have a constitutional right to disclosure of privately held privileged records? If they do, what is the basis for the constitutional right?
2. After determining that Lynch had made the showing required by Shiffra/Green, could the circuit court have invoked Wis. Stat. § 146.82(2)(a)4. to obtain [the complainant's] records without her consent?
3. Assuming a circuit court cannot obtain a witness's privileged records without her consent pursuant to Wis. Stat. § 146.82(2)(a)4., is witness preclusion always required when a defendant satisfies Shiffra/Green but the victim withholds consent to an in camera review of her privileged records?

 As noted previously, while five Justices would reverse the decision of the court of appeals — in whole or in part — no more than three Justices can agree on the same rationale or result. As a result, the law remains as the court of appeals has articulated it. See Johnson II, 353 Wis. 2d 119, ¶ 2 (per *7 curiam) ("Specifically, no [majority of] justices reach agreement to either affirm, reverse, or modify the decision of the court of appeals consistent with precedent. Consequently, the court of appeals decision remains the law of the case." (citing Phillips, 329 Wis. 2d 639, ¶¶ 1-2)).

 See, e.g., Hull v. State Farm Mut. Auto Ins. Co., 222 Wis. 2d 627, 640 n.7, 586 N.W.2d 863 (1998) ("As a general rule, when our resolution of one issue disposes of a case, we will not address additional issues.").

 Wisconsin Stat. § 948.02(1) provides, "Whoever has sexual contact or sexual intercourse with a person who has not attained the age of 13 years and causes great bodily harm to the person is guilty of a Class A felony." Sexual intercourse is defined as "vulvar penetration as well as cunnilingus, fellatio, or anal intercourse between persons or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal opening either by the defendant or upon the defendant's instruction. The emission of semen is not required." Wis. Stat. § 948.01(6).

 Wisconsin Stat. § 940.32(2) states,
Whoever meets all of the following criteria is guilty of a Class I felony:
(a) The actor intentionally engages in a course of conduct directed at a specific person that would cause a reasonable person under the same circumstances to suffer serious emotional distress or to fear bodily injury to or the death of himself or herself or a member of his or her family or household.
(b) The actor knows or should know that at least one of the acts that constitutes the course of conduct will cause the specific person to suffer serious emotional distress or place the specific person in reasonable fear of bodily injury to or the death of himself or herself or a member of his or her family or household.
(c) The actor's acts cause the specific person to suffer serious emotional distress or induce fear in the specific person of bodily injury to or the death of himself or herself or a member of his or her family or household.

 Only one of the three stalking charges arose out of Lynch's interactions with the complainant. The other two charges stem from Lynch's interactions with other women.

 The issue of whether Lynch made the requisite showing under Shiffra!Green is not at issue before this court because the State did not seek review of the court of appeals' conclusion that Lynch met the Shiffra/Green showing.

 The dissent repeatedly chastises the State for bringing the present claim before this court. See, e.g., Justice Ziegler's dissent, ¶ 189. The State's decision to appeal this case should not be harshly rebuked because the law in this case is anything but "settled." After five Justices could not reach a consensus in State v. Johnson, 2013 WI 59, 348 Wis. 2d 450, 832 N.W.2d 609 (per curiam) (Johnson I) and Johnson II, the State was left with a messy predicament. As the State explained in its petition for review, it seeks some much needed clarity:
To this day, 0 this court has never issued a precedential decision addressing — other than in passing — the state's arguments for why Shiffra rests on shaky constitutional ground and should be overruled. This case affords the court the opportunity to have all seven justices weigh in on this extremely important constitutional question.

 The protective agency was called "Children and Youth Services" ("CYS").

 The dissent repeatedly uses this footnote in Green to proclaim that we have expressly declined to overrule Shiffra. See Justice Ziegler's dissent, f 190; see also Justice Prosser's dissent, ¶ 167. In reality, this footnote shows that courts have continued to blindly adhere to poorly reasoned cases solely because they have felt compelled to do so. Any one of these courts along the way could have at least attempted to address the State and answer the question of whether a defendant has a constitutional right to access privileged information, and if so, what the basis of that right is. None did. We cannot continue to pass the buck. We must roll up our sleeves and dig into the law. Interpreting the Constitution is, after all, the ultimate responsibility of this court. See Powell v. McCormack, 395 U.S. 486, 521 (1969).

 The dissent relies on Kimble v. Marvel Entertainment, LLC, 576 U.S. _, 135 S. Ct. 2401 (2015) for the proposition that "an argument that we got something wrong — even a good argument to that effect — cannot by itself justify scrapping settled precedent." Justice Ziegler's dissent, ¶ 208. Kimble is a statutory interpretation case. Accordingly, in Kimble, the Supreme Court of the United States discussed stare decisis in the context of statutory interpretation:
What is more, stare decisis carries enhanced force when a decision .. . interprets a statute. Then, unlike in a constitutional case, critics of our ruling can take their objections across the street, and Congress can correct any mistake it sees. . . . All of interpretive decisions, in whatever way reasoned, effectively become part of *32 the statutory scheme, subject (just like the rest) to congressional changes. Absent special justification, they are balls tossed into Congress's court, for acceptance or not as that branch elects.
Kimble v. Marvel Entm't, LLC, 576 U.S. _, 135 S. Ct. 2401, 2409 (2015) (emphasis added).
Even Kimble's "general" discussion of the law speaks to stare decisis in the context of statutory interpretation, as it cites to Justice Brandeis's dissent in Burnet v. Coronado Oil & Gas Co., 285 U.S. 393 (1932). Burnet explains,
Stare decisis is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right. This is commonly true even where the error is a matter of serious concern, provided correction can be had by legislation. But in cases involving the Federal Constitution, where correction through legislative action is practically impossible, this court has often overruled its earlier decisions. The court bows to the lessons of experience and the force of better reasoning....
Id., 285 U.S. at 406-08 (Brandéis, J., dissenting) (citations omitted).
It is important to recognize the distinction between statutory interpretation and constitutional interpretation. As noted by the Supreme Court, "unlike in a constitutional case," critics of a statutory interpretation case can take their objections to the Legislature, and it can then can "correct any mistake it sees." Id. (emphasis added); see also Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 954-55 (1992) (Rehnquist, C.J., concurring in part, dissenting in part) ("Erroneous decisions in 0 constitutional cases are uniquely durable, because correction through legislative action, save for constitutional amendment, is impossible. It is therefore our duty to reconsider constitutional interpretations that depart from a proper understanding of the Constitution." (quotation marks and citations omitted)). In declaring that a defendant has a constitutional right in this case, the dissenters remove the issue from public discussion and legislative action. See Obergefell v. Hodges, 576 U.S. _, 135 S. Ct. 2584, 2625 (2015) (Roberts, C.J., dissenting) ("By deciding this question under the Constitution, the Court re *33 moves it from the realm of democratic decision. There will be consequences to shutting down the political process on an issue of such profound public significance. Closing debates tends to close minds.").
Moreover, the Supreme Court of the United States has overruled precedent when the precedential case was "badly reasoned." See Payne v. Tennessee, 501 U.S. 808, 827 (1991) ([W]hen governing decisions are unworkable or badly reasoned, 'this court has never felt constrained to follow precedent.' " (citing Smith v. Allwright, 321 U.S. 649, 665 (1944) (emphasis added))); Arizona v. Gant, 556 U.S. 332, 348 (2009) ("The doctrine of stare decisis is of course 'essential to the respect accorded to the judgments of the Court and to the stability of the law,' but it does not compel us to follow a past decision when its rationale no longer withstands 'careful analysis.' " (emphasis added) (quoting Lawrence v. Texas, 539 U.S. 558, 577 (2003)); Gant, 556 U.S. at 353 (Scalia, J., concurring) ("Justice Alito insists that the Court must demand a good reason for abandoning prior precedent. That is true enough, but its seems to me ample reason that the precedent was badly reasoned and produces erroneous (in this case unconstitutional) results."); Montejo v. Louisiana, 556 U.S. 778, 792-73 (commenting that "[b] eyond workability, the relevant factors in deciding whether to adhere to the principle of stare decisis include the antiquity of the precedent, the reliance interests at stake, and of course whether the decision was well reasoned," and noting that the precedential opinion there was "only two decades old" so "eliminating it would not upset expectations") (emphasis added)); see Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 378 (2010) (Roberts, C.J., concurring) ("When considering whether to reexamine a prior erroneous holding, we must balance the importance of having constitutional questions decided against the importance of having them decided right.").

 In case this point has not been made abundantly clear in the 15 pages detailing the countless inadequacies of Shiffra / Green, Shiffra I Green was wrongly decided, is unsound in principle, and should, therefore, be overruled. See Johnson Controls, Inc. v. Emp'rs Ins. of Wausau, 2003 WI 108, ¶¶ 98 — 99, 264 Wis. 2d 60, 665 N.W.2d 257 (overruling prec *34 edent and outlining a series of concerns a court should consider when overturning prior case law, including "whether the prior case was correctly decided," and "whether the prior decision is unsound in principle"); see also id., ¶ 100 ("We do more damage to the rule of law by obstinately refusing to admit errors, thereby perpetuating injustice, than by overturning an erroneous decision.").

 The Wisconsin Constitution provides, "In all criminal prosecutions the accused shall enjoy the right... to meet witnesses face to face . .. ." Wis. Const. art. I, § 7.

 Justice Powell's discussion of the Confrontation Clause in Ritchie garnered a plurality of the Court. 480 U.S. at 42. Justice Powell's discussion of the Compulsory Process Clause and the Due Process Clause garnered a majority of the Court. Id.

 The Wisconsin Constitution provides, "In all criminal prosecutions the accused shall enjoy the right... to have compulsory process to compel the attendance of witnesses in his behalf.. . ." Wis. Const, art. I, § 7.

 For a discussion on the interplay between the Compulsory Process Clause and the Due Process Clause, see Stacey Kime, Note, Can A Right Be Less Than The Sum Of Its Parts ? How The Conflation Of Compulsory Process and Due Process Guarantees Diminished Criminal Defendants Rights, 48 Am. Crim. L. Rev. 1501 (2011) and Sanjay Chhablani, Disentangling The Sixth Amendment, U. Pa. J. Const. L. 487, 523-29 (2009). Both law review articles advocate for a separation of the two constitutional provisions: "The rights under the Compulsory Process Clause provide the structure for a fair trial... while the Due Process Clause governs the fairness of the trial itself. . .." Stacey Kime, Note, Can A Right Be Less Than The *38 Sum Of Its Parts? How The Conflation Of Compulsory Process and Due Process Guarantees Diminished Criminal Defendants Rights, 48 Am. Crim. L. Rev. 1501,1524 (2011); see also Sanjay Chhablani, Disentangling The Sixth Amendment, U. Pa. J. Const. L. 487, 527—28 (2009) ("[W]hile the Compulsory Process Clause gives defendants the right to the issuance of subpoenas for compelling a witness's attendance in court, once that witness shows up, it is the Due Process Clause that addresses whether the witness will be allowed to testify.").

 The Wisconsin Constitution provides, "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty, and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed." Wis. Const, art. I, § 1.

 Of course, the Supreme Court of the United States could decide to create a due process right to access privileged information, in which case, we would naturally follow the Supreme Court's directive. To date, the Supreme Court has not recognized a due process right to access privileged information. See California v. Trombetta, 467 U.S. 479, 486 (explaining that the Court has allowed some access to information when a prosecutor uses his or her "sovereign powers" to "hamper" a defendant's trial, but purposely leaving open the question of whether "the Due Process Clause . . . guarantee [s] criminal defendants access to exculpatory evidence beyond the government's possession" (emphasis added)); see also People v. Hammon, 938 P.2d 986 (Cal. 1997) ("We do not, however, see an adequate justification for taking such a long step in a direction the United States Supreme Court has not gone.").

 Other states have reached the same conclusion. See, e.g., Indiana v. Fromme, 949 N.E.2d 789 (Ind. 2011); People v. Hammon, 938 P.2d 986 (Cal. 1997); Dill v. People, 927 P.2d 1315 (Colo. 1996); State v. Percy, 548 A.2d 408 (Vt. 1988); Commonwealth v. Wilson, 602 A.2d 1290 (Pa. 1992); United States v. Shrader, 716 F.Supp 2d 464 (S.D. W. Va. 2010); New Jersey v. E.P., 559 A.2d 447 (N.J. Super. Ct. App. Div. 1989) (holding that the defendant had no right to in camera review of information protected by attorney-client privilege).

 See Washington v. Texas, 388 U.S. 14, 22-23 (1967) (striking down an "arbitrary" law that disqualified an alleged accomplice from testifying on the behalf of the defendant); Chambers v. Mississippi, 410 U.S. 284, 296 n.8, 302 (1973) (striking down a "archaic, irrational, and potentially destructive" common-law rule that prevented the defendant from impeaching his own witness); Rock v. Arkansas, 483 U.S. 44, 55, 61 (1987) (applying the arbitrary and disproportionate test, and striking down a "per se" rule that excluded the defendant's hypnotically refreshed testimony because the rule "arbitrarily" excluded material evidence and because the State had not "justified the exclusion of all of [the] defendant's testimony"); Taylor v. Illinois, 484 U.S. 400, 414—16 (1988) (applying the arbitrary and disproportionate test, and upholding the trial judge's determination that the appropriate sanction for the defendant's discovery violation was to exclude the witness's testimony); Holmes v. South Carolina, 547 U.S. 319, 330-31 (2006) (applying the arbitrary and *46 disproportionate test, and striking down the State's rule barring third-party guilt evidence).

 One court has noted,
The rationale for the psychologist-client privilege was cogently stated in an Advisory Committee Note to Proposed Federal Rule of Evidence 504:
Among physicians, the psychiatrist has a special need to maintain confidentiality. His capacity to help his patients is completely dependent upon their willingness and ability to talk freely. This makes it difficult if not impossible for him to function without being able to assure his patients confidentiality and, indeed, privileged communication. Where there may be exceptions to this general rule . .., there is wide agreement that confidentiality is a sine qua non for successful psychiatric treatment. The relationship may well be likened to that of the priest-penitent or the lawyer-client. Psychiatrists not only explore the very depths of their patient's conscious, but their unconscious feelings and attitudes as well. Therapeutic effectiveness necessitates going beyond a patient's awareness and, in order to do this, it must be possible to communicate freely. A threat to secrecy blocks successful treatment.
Commonwealth v. Kyle, 533 A.2d 120, 126 (Pa. Super Ct. 1987) (alterations in original) (quoting Report No. 45, Group for the Advancement of Psychiatry 92 (1960), quoted in Advisory Committee's Notes to Proposed Rules, 56 F.R.D. at 242); see also Commonwealth v. Wilson, 602 A.2d 1290, 1295 (Pa. 1992) (citing Kyle and approving of its holding).

 See also State v. Percy, 548 A.2d 408, 415 (Vt. 1988) ("We are particularly solicitous of the need of a victim of a sexual assault to seek and receive mental health counseling without fear that her statements will end up in the public record .... We are unwilling to require the victim to forego counseling or risk disclosure absent the most compelling justification — none has been asserted here.").

 In addition to Iowa, Kentucky and Massachusetts have some type of exception that would allow a court to conduct an in camera review of a person's privileged mental health treatment records. See Ky. R. Evid. 506(d)(2); Mass. R. Evid. 503(d)(8).

 It is true that there are occasions when a defendant is wrongfully accused of committing a crime, including a sexual assault, and we realize that this is an emotionally appealing argument that favors the dissent's position. This kind of emotional appeal is heightened when members of this court use inflammatory rhetoric.
Regardless, we expect the criminal justice system to function as it is supposed to by weeding out occasions of false accusations. This is why we have an abundance of constitutional safeguards, such as the presumption of innocence, the right to confront and cross examine witnesses, and the Brady requirement. We have never before allowed the hypothetical idea that someone might be wrongfully accused to obliterate *55 our rules of evidence (for example, hearsay) or our other privileges (for example, the lawyer-client privilege). See Kyle, 533 A.2d at 131 n.15 ("We note parenthetically that permitting in camera review of information protected by the absolute privilege between psychologist and client could possibly render other absolute privileges subject to the same limitation."). Simply put, we do not toss out our constitution, our rules, or our statutes solely because a defendant might be wrongly accused; rather, we rely on our criminal justice system and its adversarial process to remove erroneous cases, including erroneous sexual assault cases.
In cases like this one, neither the prosecutor nor the defendant has access to a complainant's privileged mental health treatment records. Accordingly, "[T]he privilege does not unfairly place the defense in a disadvantageous position; like the defense, the prosecution does not have access to the [privileged] file and, thus, cannot use the information to make its case." Kyle, 533 A.2d at 130; see State v. Maday, 179 Wis. 2d 346, 370-71, 507 N.W.2d 365 (Ct. App. 1993) ("A defendant who is prevented from presenting testimony from an examining expert when the state is able to present such testimony is deprived of a level playing field. '[A] State may not legitimately assert an interest in maintenance of a strategic advantage over the defense, if the result of that advantage is to cast a pall on the accuracy of the verdict obtained.1" (emphasis added) (alteration in original) (quotingAAe v. Oklahoma, 470 U.S. 68, 79) (1985))). Indeed, if the prosecution had access, it may need to disclose the records pursuant to Brady.
Brady is the reason Lynch already has access to some of the complainant's mental health treatment records. Prior to the complainant's father's trial, the complainant waived her privilege, which allowed the State to obtain certain mental health treatment records to prosecute her father. In the present case, the State turned over all of the mental health treatment records it had in its possession from when it prosecuted the complainant's father.
Let us be clear: in this case, we do nothing more than decline to create a constitutional right. We leave the question of whether a Shiffra / Green-like exception to the privilege statute is right for Wisconsin to the Legislature, which may, if *56 so inclined, create an exception to the statute it has amended numerous times. Similarly, we leave the question of whether there is a constitutional right to access privileged information to the Supreme Court of the United States, which may, if so inclined, declare that a constitutional right to this type of information exists.